**Opinion issued May 7, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00940-CR

———————————

**CHRISTIAN DION BLACK, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 337th District Court**
**Harris County, Texas**
**Trial Court Case No. 1248898**

## MEMORANDUM OPINION

A jury convicted appellant of murder and assessed punishment at confinement for life. In four issues on appeal, appellant contends the trial court erred by (1) admitting evidence of extraneous offenses; (2) denying a mistrial based on external jury influence; and (3) denying a mistrial after an emotional

outburst before the jury by a spectator. Appellant also contends that (4) the evidence is legally insufficient to support his conviction. We affirm.

## BACKGROUND

On the morning of January 15, 2010, Virgil Fuselier failed to show up for his scheduled shift as a delivery driver at Glacier Food Company. Fuselier's supervisor contacted his relatives because it was unusual for Fuselier not to show up for work. When Fuselier's family was unable to reach him by phone, his young brother, Dwight, drove to Fuselier's duplex. Dwight noticed that Fuselier's pickup truck was missing and there were bloodstains on the front door. When no one answered the door, Dwight called 911.

A sheriff's deputy arrived at the scene and instructed the property manager to open the door with the master key. Upon entering the home, they discovered Fuselier's body lying face down in a pool of blood just inside the doorway. There was blood smeared on the walls and across the floor. The trail of blood seemed to originate in the bedroom. An autopsy revealed that Fuselier had died from multiple stab wounds. In Fuselier's bedroom, police collected a cigarette butt and Fuselier's wallet from the top of the dresser, as well as a bloody, blue hooded sweatshirt and a bloody pocket knife. Some items, including his debit card, were missing from Fuselier's wallet.

The police subpoenaed Fuselier's bank records after they discovered that his debit card was missing and discovered that there had been several withdrawals from a nearby convenience store after Fuselier's death. Sergeant C. Clopton obtained surveillance footage from the day before and two days after the murder. On footage from the day before the murder, Clopton saw a man wearing a blue hooded sweatshirt that looked like the one recovered at the murder scene use the ATM. Footage from the following days showed the same man using the ATM, now wearing a grey hooded sweatshirt.

On January 21, as Sergeant Clopton was leaving the convenience store after viewing the surveillance footage, he saw the man in the grey hooded sweatshirt, appellant, walking towards the store. Clopton waited until appellant left the store before approaching him and ordering him to remove his hands from his pockets. Appellant made a sudden movement, which caused Clopton to detain him at gunpoint. The officer then found a loaded .45 caliber pistol and marijuana in the appellant's pockets. Police also took a DNA swab from appellant and determined that appellant's DNA matched that on the knife, blue sweatshirt, cigarette butt, and wallet recovered from the scene of the murder.

Appellant was arrested and transported to the police station for questioning. Appellant gave a recorded statement, in which he claimed that he got appellant's debit card from some man who owed him money. Appellant admitted that he had

3

worn the sweatshirt found at the murder scene, but claimed that he had given it away before the murder occurred. He also stated that he gave the pocket knife away before the murder.

After appellant's repeated denials, Officer Clopton suggested the idea of self-defense to appellant during questioning.

> [Clopton]: The only reason I'm sitting here talking to you now is to get an explanation, to from you as to what happened, is it just that you just a cold blooded murderer and you set this up and you knew you was gonna go there and kill him and take his money off his card, or, did something happen, y'all got into some kind of argument or something, y'all got into a fight, he gets the worse of it, then you decide, well he's dead now I'ma take the money off his card, you just took advantage of the situation, or, did you plan this, was this a cold blooded murder, or, did something happen, that's why we're here talking to you to get that explanation . . . .
>
> \* \* \* \*
>
> So, yeah, you could be fooling me, but I don't see you as that cold blooded killer, but it that's the way you wanna be, then go ahead and say it, it ain't gonna be nothing personal, because I'ma be gone, I go home, it's your future you thinking about, what's gonna happen to you, I'ma still be the same, man, and if you want to give me this bullshit about you gave your jacket to somebody, it just ain't gonna fly man, it just ain't gonna fly, it ain't possible, excuse me, it ain't possible, you need to man up Chris, I know it's hard man, but I just don't want to believe you planned on killing him, that you're that cold blooded, I don't want to believe that, but if you don't tell me, whose gonna tell me, whose gonna tell me man, (pause) talk to me Chris (pause) I know it's hard to get out, Chris. You want to tell me yes or no, I ask you a question, was it on purpose or was it an accident, can you like ease into it, I know it's hard to get it out there hey look I'm responsible, did you go over there to murder this man, (pause), did you?

[Appellant]: No.

[Clopton]: Did something go wrong, that was unplanned?

[Appellant]: (he nods head yes).

Thereafter, appellant gave his version of the events the night of the murder. Appellant claimed that he and Fuselier had a relationship whereby Fuselier would pay appellant for oral sex. Appellant claimed that he visited Fuselier twice a week, and over the course of their relationship Fuselier withdrew money from his Chase debit card to give to the appellant after sexual intercourse.

On the night of the murder, appellant claimed that he and Fuselier were drinking at Fuselier's home. Fuselier, for the first time in their relationship, requested anal sex from the appellant. When appellant refused, he claimed that Fuselier tried to "[f]orce himself onto me, he tried to force himself on me." Appellant was not willing to have anal sex, so took his knife out of his pocket and proceeded to stab Fuselier, claiming "[i]t was in self-defense." The altercation spread from the bedroom to the living room front door where Fuselier fell dead. Appellant then smoked a cigarette, took Fuselier's debit card, locked the front door, and left in Fuselier's Ford truck.

After his statement, appellant was charged with capital murder. At trial, he was found guilty of the lesser offense of murder, and this appeal followed.

5

# EXTRANEOUS OFFENSES

When appellant was arrested and searched incident to arrest, police recovered a handgun and several bags of marijuana. In his first point of error, appellant contends the trial court erred by admitting evidence of the handgun and marijuana, which he contends was a violation of Rule 404(b) of the Texas Rules of Evidence.

## A.    Preservation of Error

The State contends that appellant waived the issue of the admission of the marijuana and handgun because he permitted Sergeant Clopton to testify about it without objection and then permitted the same evidence to be introduced later at trial, again without objection. However, before any testimony was heard, and outside the presence of the jury, the following exchange took place:

> [Trial Court]:   [Defense counsel] indicated he wished to take something up prior to the jury being brought in.
>
> [Defense counsel]:  That is correct, Your Honor. When Mr. Black was arrested, he had a pistol on him and marijuana. This was two days after this event that we are on trial with. We see no relevance, no connection between that and the issue that we are on trial with under 404(b) for the State to get into that. We'd ask the Court not to allow them to get into that.
>
> * * * *
>
> [Prosecutor]:  Judge, as you know, we have to prove robbery and murder in this case. The defendant takes the complainant's debit card, he uses over $800 on that debit card. By his own admissions, he uses that stolen money from the robbery portion to purchase the drugs and the gun because he wants to be a drug dealer. So, it goes to the intent

6

to rob him, Judge. And we believe it's relevant for that issue, because we do have to prove the robbery.

\* \* \* \*

[Defense counsel]: Once again, I disagree. This is capital murder. They are trying to connect the death to the robbery, but this is two days later when he is arrested and we fail to see the connection.

[Trial court]: All right. Your objection will be overruled. ***It will be admitted.***

An adverse ruling on a pretrial motion to suppress evidence will ordinarily suffice to preserve error on appeal, and a defendant need not specifically object to the evidence when it is later offered at trial. *Thomas v. State*, 408 S.W.3d 877, 881 (Tex. Crim. App. 2013). Thus, even though the State has not done so, we will address the merits of appellant's first point of error.

## B.     Standard of Review

Appellant contends the trial court erred in admitting evidence of his possession of the gun and marijuana because they were evidence of extraneous offenses, which are generally inadmissible under the Texas Rules of Evidence. *See* TEX. R. EVID. 404(b). Under Rule 404(b), evidence of other crimes, wrongs, or bad acts is not admissible if it is offered to prove the character of a person in order to show action in conformity therewith, though it may be admissible for other purposes. *Id.* Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court; thus, a trial court's ruling on the admissibility of extraneous offense evidence is

7

reviewed under an abuse of discretion standard. *See Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007); *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). As long as the trial court's ruling is at least within the zone of reasonable disagreement, the appellate courts will not intercede. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g); *see also Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002) (no abuse of discretion if decision on admission of evidence is supported by the record). A trial court's ruling is generally within the zone of reasonable disagreement if the evidence shows that (1) an extraneous offense is relevant to a material, non-character conformity issue and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading to the jury. *See Montgomery*, 810 S.W.2d at 377–78. In this regard, evidence of an extraneous offense may be admissible for the purpose of showing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See* TEX. R. EVID. 404(b).

### C. Analysis

In this case, the indictment alleged:

Before you would be warranted in finding the defendant guilty of capital murder, you must find from the evidence beyond a reasonable doubt not only that on the occasion in question the defendant was in the course of committing or attempting to commit the felony offense of robbery of Virgil Fuselier, as alleged in this charge, but also that the defendant specifically intended to cause the death of Virgil

Fuselier, by stabbing Virgil Fuselier, with a deadly weapon, namely a knife, and unless you so find, then you cannot convict the defendant of the offense of capital murder.

Before me, the undersigned Assistant District Attorney of Harris County, Texas, this day appeared the undersigned affiant, who under oath says that he has good reason to believe and does believe that in Harris County, Texas, CHRISTIAN DION BLACK, hereafter styled the Defendant, heretofore on or about JANUARY 16, 2010, did then and there unlawfully while in the course of committing and attempting to commit the ROBBERY of VIRGIL FUSELIER, intentionally cause the death of VIRGIL FUSELIER by STABBING THE COMPLAINANT WITH A DEADLY WEAPON, NAMELY A KNIFE.

The jury charge similarly provided:

Therefore, if you find from the evidence beyond a reasonable doubt that on or about the 15th day of January 2010, in Harris County, Texas, the defendant, Christian Dion Black, did then and there unlawfully, while in the course of committing or attempting to commit the robbery of Virgil Fuselier by stabbing Virgil Fuselier with a deadly weapon, namely a knife, then you will find the defendant guilty of capital murder, as charged in the indictment.

The jury charge defined robbery as follows:

A person commits the offense of robbery if, in the course of committing theft, as that term is hereinafter defined, and with intent to obtain or maintain control of property of another, he:
    (1) intentionally or knowingly causes bodily injury to another; or
    (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.

The State argued at trial that the gun and marijuana recovered during appellant's arrest two days after the murder was relevant to show appellant's intent to commit a robbery. We agree. As is clear from the indictment and charge, the State bore the

burden of proving not only that appellant intended to cause Fuselier's death, but also that he was in the course of committing a robbery at the time of the murder. The State presented evidence, i.e., appellant's confession, directly linking the gun and marijuana to the robbery. Specifically, the following exchange took place while appellant was being questioned by police:

[Officer]: Well, how did you, how did [the gun] get in your pants?

[Appellant]: I bought it, I bought it off the streets.

[Officer]: When did you buy it?

[Appellant]: I told you I got it like a month ago, really, I got it like a few days ago.

[Officer]: Well earlier you told me you bought it from your uncle.

[Appellant]: I know.

[Officer]: And uh, now you're saying you bought it off the street, you told me it was about a month ago, so, *did you buy it since you got that money off the card, did you buy it within the last couple of days, last week?*

[Appellant]: Yeah.

[Officer]: *And you bought it with the money from, uh, that you got off the card?*

*[Appellant]: Yeah.*

[Officer]: What about all that marijuana you had on you?

[Appellant]: I smoke weed.

*[Officer]: I know you smoke weed, but, that's bagged up.*

10

***[Appellant]: That's why I bought the pistol.***

[Officer]: But that's bagged up like you gonna sell it and make even more profit.

[Appellant]: I thought about it like, I smoke weed.

[Officer]: Well, who bagged it up like that, it's, some of it's in a big bag, and then some of it is individually bagged within a bag, that means you gonna sell it like nickel bag, dime bag, or what not.

[Appellant]: I bagged it up.

[Officer]: Okay.

[Appellant]: I bagged it up.

[Officer]: But I means, so did you buy it with that money so that you could make more money off of it, I mean, that's the game you was gonna get in, you was gonna be slanging dope?

[Appellant]: I was waiting on another job, ***I had bought me some week cause I smoke, I had bought a big thang of weed, cause I smoke a lot, and I was like, well I'll sell a little bit,*** while I got it, I wasn't trying to make a living off it.

This statement by appellant directly linked the gun and marijuana to the debit card stolen from the scene of the crime. Appellant admitted that he used the stolen debit card to purchase the gun and marijuana.

In *Peters v. State*, the case relied on by appellant, a gun and marijuana were recovered from a hotel room that the defendant had been occupying after the defendant was arrested for possession of cocaine. 93 S.W.3d 347, 350 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). On appeal, appellant contended the

11

trial court erred in admitting the evidence of the marijuana and the shotgun, and the court of appeals agreed, holding that (1) the gun and marijuana were not relevant to the only issue in the case, i.e., whether the officers had consent to search, and (2) the gun and marijuana were not "same transaction contextual evidence" because their recovery from the hotel room was not so intertwined with the charged offense and the issue of consent that the jury could not understand the testimony without it. *Id.* at 353.

In contrast, in this case, appellant's intent to commit robbery was a highly disputed element of the case. The State contended that appellant intended to commit robbery at the time of the murder, arguing that appellant wanted money so that he could purchase and deal drugs, while appellant argued via his statement that he only took appellant's credit card and truck as an afterthought "cause [he] was broke." Evidence that appellant used the stolen credit card to purchase marijuana, which he planned to sell, and a gun to protect that marijuana, had a "tendency to make the existence of any fact that is of consequence to the determination of the action," here, the element of robbery, "more probable or less probable than it would be without the evidence." *See* TEX. RULE EVID. 401 (defining relevant evidence). Because the State directly tied the marijuana and gun to the stolen credit card, the evidence in this case was relevant to a disputed issue, robbery. As

12

such, this case is distinguishable from *Peters*, in which the marijuana and gun had no relevance to the only issue in the case, i.e., consent.

Accordingly, we overrule issue one.

## EXTERNAL JURY INFLUENCE

In issue two, appellant contends the "trial court erred by failing to grant a mistrial when there was external jury influence in trial and the court did not question the jurors individually for potential improper influence."

Outside the presence of the jury, an assistant district attorney not involved in this case, B. Exley, notified the trial court that she had seen a defense attorney, who was also not involved in this case, speaking to a juror on the elevator about "jail and cases."

> [Exley]: There was a defense attorney in the elevator talking to that juror about jail and cases. And he was sort of rambling and didn't say anything specific about this case. He was admonished by several people to stop talking to that juror about jail and being a defense attorney. And he yelled back at that other lawyer: I can talk to her about whatever I want, I'm not talking to her about her case. And so, I had to get off the elevator. I don't know if she got spooked or not, but I wanted—if you don't mind, I'm going to hang around in case that juror feels the need to approach you. Again, I don't hear anything particular about this case or any particular case, but it was rather disconcerting in the elevator because—and for the record, the lawyer was Bill Johnson, who is a defense attorney, who's been around for a while. Despite him being admonished to stop talking, he got more vocal and continued to talk.
>
> [Defense counsel]: Judge, I'd like to possibly have her brought in, the juror, to see if there was anything—

13

\* \* \* \*

I think at least for the record we need to get her checked and see if there was any problem.

Thereafter, the trial court spoke with the juror and the following exchange took place:

> [Trial court]: Come up here with me for a second. I understand you were on the elevator this morning and some lawyer was talking to y'all about things. Is that correct?
>
> [Juror]: He was talking about something else. He didn't talk about our case.
>
> [Trial court]: Was there anything about his conduct that caused any problem?
>
> [Juror]: He made a joke about Rolling Stones or something.
>
> [Trial court]: Okay. But it has no [e]ffect on y'all whatsoever?
>
> [Juror]: No.
>
> [Trial court]: Go on back. Thank you very much.
>
> \* \* \* \*
>
> [Defense counsel]: Judge, I would like to on the record that since these jurors have been, I think, indirectly, directly influenced by the comments that were made on the elevator a few moments ago, a case of this magnitude, we'd ask that a mistrial be declared. We think it's too prejudicial and it may impact this proceeding. We think it's just too important to take a risk with these jurors who may be prejudiced subconsciously by the statements of this criminal defense lawyer. So, we would move at this point that a mistrial be declared.
>
> [Trial court]: That's denied.

## A. Standard of Review and Applicable Law

We review a trial court's denial of a motion for a mistrial for an abuse of discretion. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). We view the evidence in the light most favorable to the trial court's ruling, considering only those arguments before the court at the time of its ruling. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). We uphold the ruling if it was within the zone of reasonable disagreement. *Id.*

A mistrial is an appropriate remedy in extreme circumstances for a narrow class of highly prejudicial and incurable errors. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000); *Bokemeyer v. State*, 355 S.W.3d 199, 202 (Tex. App.—Houston [1st Dist.] 2011, no pet.). A mistrial halts trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999); *Bokemeyer*, 355 S.W.3d at 203. The particular facts of the case determine whether an error requires a mistrial. *Ladd*, 3 S.W.3d at 567. Because a mistrial is an extreme remedy, a trial court should grant it "only when residual prejudice remains" after less drastic alternatives are explored. *Barnett v. State*, 161 S.W.3d 128, 134 (Tex. App.—Fort Worth 2005), *aff'd*, 189 S.W.3d 272 (Tex. Crim. App. 2006); *Bokemeyer*, 355 S.W.3d at 202.

A juror must make decisions at the guilt and punishment phases using information obtained in the courtroom: the law, the evidence, and the trial court's mandates. *Granados v. State*, 85 S.W.3d 217, 235 (Tex. Crim. App. 2002). "No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court." TEX. CODE CRIM. PROC. ANN. art. 36.22 (Vernon 2006); *see also* TEX. R. APP. P. 21.3(f) (providing that defendant must be granted new trial when juror has talked with anyone about case). The primary goal of article 36.22 is to insulate jurors from outside influence. *Chambliss v. State*, 647 S.W.2d 257, 266 (Tex. Crim. App. 1983); *cf. Gomez v. State*, 991 S.W.2d 870, 872 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (holding that no violation of article 36.22 existed when two jurors discussed case with each other in public place). "Therefore, if a violation is shown, the effectiveness of possible remedies will be determined in part by whether the conversation influenced the juror." *Ocon*, 284 S.W.3d at 884.

When a juror converses with an unauthorized person about the case, "injury to the accused is presumed" and a new trial may be warranted. *Robinson v. State*, 851 S.W.2d 216, 230 (Tex. Crim. App. 1991); *Bokemeyer*, 355 S.W.3d at 203. To invoke this presumption, the defendant must show the communication involved matters concerning the defendant's trial. *Chambliss*, 647 S.W.2d at 266; *Bokemeyer*, 355 S.W.3d at 203. We presume harm even when the communication

16

does not rise to the level of a full-blown conversation or discussion of the specifics of a given case. *McIntire v. State*, 698 S.W.2d 652, 659 (Tex. Crim. App. 1985); *Bokemeyer*, 355 S.W.3d at 203. However, the State may rebut this presumption of harm by showing that the defendant has not been injured, i.e., "that the case was not discussed or that nothing prejudicial about the accused was said." *Green v. State*, 840 S.W.2d 394, 406 (Tex. Crim. App. 1992); *compare Gates v. State*, 24 S.W.3d 439, 443 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (holding that State rebutted presumption, when victim's son communicated with juror prior to his testimony at trial, because only new information son conveyed to juror was that he was witness in case), *with Ites v. State*, 923 S.W.2d 675, 677–78 (Tex. App.— Houston [1st Dist.] 1996, pet. ref'd) (reversing trial court's judgment because State failed to rebut presumption of harm when defendant's son ran in front of jurors saying that if he had to spend an hour with his father, he would kill himself; defendant was being tried for aggravated sexual assault of his daughter, and son had been sworn as witness). "If evidence is in the record that rebuts the presumption of harm, it should be considered, whether presented by the State or the defense." *Alexander v. State*, 919 S.W.2d 756, 767 (Tex. App.—Texarkana 1996, no pet.). When determining whether the State sufficiently rebutted the presumption of harm, we view the evidence in the light most favorable to the trial court's ruling and defer to the trial court's resolution of historical facts and its

determinations concerning credibility and demeanor. *Quinn v. State*, 958 S.W.2d 395, 401–02 (Tex. Crim. App. 1997); *Bokemeyer*, 355 S.W.3d at 204.

## B.  Analysis

Here, there is no presumption of harm to appellant by the unauthorized contact between a defense attorney who was not involved in the case and the juror because the trial court's questioning of the juror revealed that the attorney "didn't talk about our case." *See Chambliss*, 647 S.W.2d at 266 (holding that to invoke presumption, defendant must show communication involved matters concerning defendant's trial); *Bokemeyer*, 355 S.W.3d at 203 (same).  Further, even if the presumption was raised, the State rebutted it by presenting evidence that "the case was not discussed or that nothing prejudicial about the accused was said." *See Bokemeyer*, 355 S.W.3d at 203.  The juror told the court that the defense attorney "made a joke about [the] Rolling Stones," and that his comments "[had] no [e]ffect on y'all whatsoever."

Thus, we conclude that the trial court did not err in denying appellant's motion for mistrial.  Regarding appellant's assertion on appeal that the trial court should have "question[ed] the jurors individually for potential improper influence," we note that appellant never asked the trial court to do so.  Defense counsel requested only that "I'd like to possibly have *her* brought in, the juror, to see if there was anything," and "we need to get *her* checked and see if there was any

18

problem." Because appellant never requested that the other jurors be questioned, his contention on appeal that they should have been is waived. *See* TEX. R. APP. P. 33.1(a).

We overrule appellant's second issue.

## DENIAL OF MISTRIAL

In his third issue, appellant contends the "trial court erred in failing to grant [a] mistrial when [the] prosecutor stated [that the] 'Fuseliers have waited since 2010 for justice' after [an] emotional outburst had already occurred from [a] family member."

During the prosecutor's closing argument, she showed an exhibit and stated, "You see that entryway where Virgil is lying in his own pool of blood." Some sort of disturbance then occurred, and the trial court stated, "Pardon me, Ms. Reyna. Members of the jury, remember your admonishments." The jury was immediately removed from the courtroom, and the following exchange took place:

> [Defense counsel]: You know, Judge, we'd like to put something on the record. Judge, just for the record, we would like the record to reflect that in the middle of the State's presentation, the State put up Exhibit—what number is that?
>
> [Prosecutor]: No. 33
>
> [Defense counsel]: State put up Exhibit No. 33 in the middle of her argument and one of the family members, it had such an effect upon her that she yelled out an emotional expression, which is understandable, but the jury surely heard that. The Court took a ten-minute break to let the composure sort of settle down, but we feel that

19

because of that outburst Mr. Black's constitutional rights, Article 1, Section 10.19 of the Texas Constitution, Articles 4, 6, and 14 of the United States Constitution have been violated. And we feel he cannot receive a fair verdict from this jury because of the emotional outburst. We would respectfully ask that a mistrial be declared at this point, Your Honor.

[Trial court]: That's denied. So that the record is clear, the Court was observing the courtroom and saw that something was about to occur in court and had the jury removed. And most of the rest of the verbal outburst came after the jury had been removed from the courtroom. So, the Court does not believe that they saw any of the additional circumstances that occurred after they were out of the courtroom.

[Defense counsel]: Judge, for the record, do you mind if we talk to the jurors individually, poll them and see if there was anything that occurred during argument that may affect their verdict.

[Trial court]: No, sir, not at this time.

[Defense counsel]: Thank you. I'd just renew my objection.

[Trial court]: All right. Members of the jury, as we said earlier in the trial, these are your courtrooms and you are certainly welcome to be here, but it is my job to see that both sides of this lawsuit, the victim's family and the defendant and his family, are entitled to a fair trial. Mostly the victim and the defendant themselves. There are things that are going to be said, that are going to be introduced with the television sets in the courtroom where all can see. So, if you feel like you cannot handle something said or something seen, then I will ask you to remove yourself now. We must have quiet in the courtroom while this is being argued to the jury. Bring me the jury, please.

The jury was returned to the courtroom, and the prosecutor finished her closing argument, which she concluded by stating:

[Prosecutor]: Ladies and gentlemen, the Fuseliers have waited a long time, since 2010, for justice.

20

[Defense counsel]:  Your Honor, I object.  That's improper.

[Trial court]: That's sustained.

[Defense counsel]: I'd like the jury to be instructed.

[Trial court]: Disregard the last statement and do not consider it for any purpose whatsoever.

[Defense counsel]: Move for a mistrial, Your Honor.

[Trial court]:  That's denied.

## A.	Standard of Review and Applicable Law

"A trial judge's denial of a motion for mistrial is reviewed under an abuse of discretion standard, and his ruling must be upheld if it was within the zone of reasonable disagreement." *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). The Texas Court of Criminal Appeals has held that outbursts from bystanders or witnesses that interfere with the normal proceedings of a trial will not result in reversible error unless the defendant shows that a reasonable probability exists that the conduct interfered with the jury's verdict. *Id.* "In the context of such outbursts, the trial judge's instructions to disregard are generally considered sufficient to cure the impropriety because it is presumed that the jury will follow those instructions." *Id.* "In most instances, an instruction to disregard the remarks will cure the error." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). Because a mistrial is an extreme remedy, a trial court should declare a mistrial only when the error or misconduct is highly prejudicial and

21

incurable. *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003); *Hudson v. State*, 179 S.W.3d 731, 738 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

## B.    Analysis

In *Stahl v. State*, 749 S.W.2d 826, 832 (Tex. Crim. App. 1988), the prosecutor called the victim's mother as a witness. *Id.* at 828. Knowing she was predisposed to emotional outbursts, the prosecutor asked the mother to identify a photograph of her dead son. *Id.* The mother burst into tears, exclaiming, "Oh, my god. My baby. My God . . . May he rest in hell. May he burn in hell. Oh, my baby." *Id.* at 828–29. Although the trial court instructed the jurors to disregard the mother's statements, the prosecutor "exacerbated" the impact, repeatedly referring to the incident during the State's closing argument. *Id.* at 830. The court held that this "deliberate" and "persistent" conduct, "in direct contravention of prior rulings by the judge" established the prosecutor's attempt to improperly sway the jury. *Id.* at 830–31. There was even a suggestion that the prosecutor orchestrated the mother's outburst. *Id.* at 827.

This case is not like *Stahl*. In this case, there is no evidence or even a suggestion that the prosecutor orchestrated the emotional outburst. Indeed, the record is not clear as to who made the outburst or what was said. And, the trial court, sensing that an outburst was imminent, immediately removed the jury from the courtroom and instructed them to "remember your admonishments." We

22

presume that the jury followed that instruction. *Coble*, 330 S.W.3d at 292. Additionally, the trial court further found that "most of the rest of the verbal outburst came after the jury had been removed from the courtroom." And, unlike *Stahl*, the prosecutor did not repeatedly refer to the outburst during closing. The prosecutor's sole comment that "the Fuseliers have waited a long time, since 2010, for justice" was not a direct reference to the outburst and did not immediately follow the outburst. And, the prosecutor's comment, which was followed by a request that "you be the voice for Virgil Fuselier, [and] find this defendant guilty of capital murder," was a proper plea for law enforcement and was not an attempt to convey any specific facts about the emotional effect of the victim's death on his family. *See Martinez v. State*, 17 S.W.3d 677, 693 (Tex. Crim. App. 2000) (holding that prosecutor's comment that family of murdered victims "cry out to you" for death penalty was proper plea for law enforcement because argument "did not attempt . . . to convey any specific facts about the effect of the victims' deaths upon their families," but was plea to give defendant death penalty because he deserved it.).

Accordingly, we overrule issue three.

**SELF-DEFENSE**

In his fourth issue, appellant claims the State failed to prove that he did not kill Fuselier in self-defense. Specifically, appellant argues that "Black was already

23

in the zone of danger when Fuselier attempted to rape him[,]" and "was threatened with immediate apprehension of serious bodily injury and reasonably used his small picket knife to defend himself from Fuselier's attempted rape."

## A. Standard of Review and Applicable Law

A person is justified in using deadly force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a)(2)(A) (Vernon 2011). "Deadly force" is force "intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3).

The initial burden to produce evidence supporting self-defense rests with the defendant. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). Once the defendant produces some evidence, the State bears the ultimate burden of persuasion to disprove the raised defense. *Saxton*, 804 S.W.2d at 913. This burden of persuasion does not require that the State produce evidence, but it does require that the State prove its case beyond a reasonable doubt. *Id.* The issue of self-defense is a fact issue to be determined by the jury, which is free to accept or reject any defensive evidence on the issue. *Id.* at 913–14. If the jury finds the defendant guilty, then it implicitly finds against the defensive theory. *Id.* at 914.

When reviewing a sufficiency challenge on the issue of self-defense, a reviewing court views the evidence in the light most favorable to the verdict to see if any rational trier of fact could have found (1) the essential elements of murder beyond a reasonable doubt, and (2) against appellant on the self-defense issue beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914. The jury is the exclusive judge of the credibility of the witnesses and of the weight to be given to their testimony. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). Reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Id*. We resolve any inconsistencies in the testimony in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

### B. Analysis

Here, the only evidence of appellant's claim that he stabbed Fuselier in self-defense to prevent Fuselier from raping him came from his own confession to police, which the jury was entitled to disbelieve. *Jones*, 944 S.W.2d at 647. The jury could have found this portion of appellant's confession to be not credible because appellant repeatedly denied involvement in the murder and made no allegations of sexual assault until Sergeant Clopton suggested a self-defense theory, at which time appellant changed his story and claimed for the first time that he was a victim of sexual assault. The jury could also have disbelieved appellant because he suffered no defensive injuries, but the victim had been stabbed over 20

25

times. Also inconsistent with appellant's self-defense theory is the evidence that he stole the victim's truck and credit cards, and then used those credit cards to repeatedly withdraw money from the victim's account so that appellant could buy marijuana and a gun.

Viewing the evidence in the light most favorable to the verdict, the jury could have found the elements of the crime beyond a reasonable doubt and concluded that appellant did not act in self-defense. *See Saxton*, 804 S.W.2d at 914.

We overrule issue four.

## CONCLUSION

We affirm the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Brown and Lloyd

Do not publish. TEX. R. APP. P. 47.2(b).